**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Robert E. Myers, et al.,

                   Plaintiffs,

      v.

Coshocton Village Inn & Suites, et al.,

                  Defendants.

Case No. 2:14-cv-981

Judge Graham

<u>Opinion and Order</u>

Plaintiffs Robert and Sherrie Myers, who are husband and wife, bring this negligence and loss of consortium action against defendants Coshocton Village Inn & Suites, Coshocton Village Inn, Ltd., and C.P. Management Company, Inc. Mr. Myers alleges that he suffered head and neck injuries from a slip-and-fall accident that occurred while he was a guest at the Coshocton Village Inn & Suites in Coshocton, Ohio on July 28, 2012.

This matter is before the court on defendants' motions for summary judgment. For the reasons stated below, the motions are granted in part and denied in part.

**I.      Factual Background**

Plaintiffs are Pennsylvania residents. Mr. Myers is an attorney who traveled to Coshocton on July 27, 2012 to attend a meeting at the Coshocton Village Inn on the next day. <u>See</u> Myers Dep. at 57-58. He was scheduled to talk to a group of railroad workers and union officials and to answer their legal questions. <u>Id</u>. at 56-57.

Defendant Coshocton Village Inn, Ltd. is an Ohio limited liability company with its principal place of business in Ohio. It owns and operates the Coshocton Village Inn at 115 North Water Street in Coshocton, Ohio. Defendant C.P. Management Company, Inc. is an Ohio corporation with its principal place of business in Ohio. It manages the Coshocton Village Inn pursuant to a management agreement with Coshocton Village Inn, Ltd.

Myers stayed in Room 217 at the Coshocton Village Inn. When one enters Room 217, a desk is against a wall on the right-hand side of the entry area and the bathroom is on the left-hand side. The desk and bathroom door are on opposite sides of an entry area that is approximately 6 feet wide and 15 feet long. Once a person has walked about 15 feet into Room 217, the room opens

1

up into the main sleeping area.  Against the wall on the right-hand side are a kitchenette, chair and dresser with a television on top of it.  On the left-hand side are a hot tub, a nightstand with a desk lamp, the bed and a second nightstand and lamp in the far left-hand corner.  See Myers Dep. Exs. A-J (photographs of Room 217).

The hot tub is divided from the bathroom by a wall.  The hot tub has four sides: one side of the hot tub is against the wall that is shared with the bathroom, another side is along the wall shared with another room, one side faces the bed, and the other side faces the kitchenette.  The hot tub basin is situated inside a 5-foot by 6-foot rectangular structure that has wood side panels on the sides facing the bed and the kitchenette and that has a 7-inch top ledge made of tile.  The room is carpeted, and the carpet runs up against the base of the wood side panels that face the bed and kitchenette.  The top perimeter of the hot tub has a relatively narrow and flat edge or lip that is part of the tub basin itself; this top edge is surrounded on the outside by the tile ledge, which is also flat. The top edge of the tub basin is slightly higher than the tile ledge and it broadens in the corners, whereas the tile ledge is the same width all of the way around the tub.  There are two metal handles for operating the hot and cold water to fill the hot tub.  These handles are located on the top flat edge of the tub basin where it broadens in the corner of the hot tub that juts into the main sleeping area.  See Myers Dep. Exs. A-J; Expert Report of Andrés Calderón, Doc. 65-5 at PAGEID#672.

Myers traveled by airplane to Columbus on July 27, 2012 and rented a car to drive to Coshocton.  See Myers Dep. at 58, 132.   He arrived at the hotel sometime in the afternoon of July 27 and checked into Room 217.  Id. at 58, 65.  He had a bag on rollers and stopped in the room only long enough to place his bag on the desk, take some papers out of the bag and use the restroom.  Id. at 60-64.  Both the desk and bathroom were near the door to the room, and Myers did not walk past the desk or look around the room.  Id. at 73-74.

Myers then left the hotel and drove to a nearby restaurant to get something to eat.  Id. at 67. He visited the area known as Roscoe Village, spent a good bit of time walking around and found a place to sit outdoors and read deposition transcripts for a case he was working on.  Id. at 68-69.  In the evening, he ate dinner and returned to his hotel room around dusk.  Id. at 69-70.

Benjamin Martin, a railroad conductor who held the position of general chairman of the Brotherhood of Locomotive Engineers and Trainmen, was also staying at the Coshocton Village Inn to attend the railroad workers meeting on July 28.  See Martin Dep. at 18.  He had become acquainted with Myers over the years because of Myers's law practice in issues concerning railroad workers.  Id. at 22.  Martin testified that he flew into Columbus from New York and that Myers

picked him up in the rental car and they drove to Coshocton.  Id. at 24.  They arrived at the hotel sometime between noon and 1:30 p.m.  Id. at 26.  Martin and Myers parted ways during the afternoon.  Martin recalls meeting Myers at the hotel around 6:00 p.m. to go out for dinner.  Id. They drove to a nearby restaurant and had dinner at about 6:30 p.m. with two other individuals who were in Coshocton for the meeting.  Id. at 27-28.  They arrived back at the hotel around dusk.  Id. at 30.

Myers returned to his room in the evening and got ready to go to bed.  See Myers Dep. at 74-75.  He turned the TV on and sat on the bed, with pillows propped behind his back, and read another deposition transcript.  Id. at 76.  The light in the bathroom was on, with the bathroom door mostly closed, and the light on the nightstand in the far corner of the room was turned on.  Id. at 85-86.  Myers fell asleep at some point and woke with the lights and TV still on and the deposition transcript by him on the bed.  Id. at 89-93.  He saw that it was after 2:00 a.m., slid to the foot of the bed, turned the TV off and stood to put the TV remote on the dresser.  Id. 92-93.  He then walked to the desk and placed the deposition transcript on it and used the bathroom, again leaving the bathroom light on afterward with the door cracked open.  Id. at 93-94.

Barefoot, Myers walked back towards the bed.  Id. at 95.  He testified that his left foot was a "few inches" away from the base of the hot tub when, as he was stepping on that foot, it hit a wet spot on the carpet and slid.  Id. at 95, 166.  His left foot slid to the left and forward and struck the side of the hot tub near the corner.  Id. at 166.  Myers testified that his body started falling forward to the left but that the impact of his foot hitting the hot tub caused his body to twist or spin.  Id. at 95, 158-60, 166.  He further testified that he fell backward in the direction of the nightstand (the one located between the hot tub and bed) and that the back of his head hit the front edge of the nightstand.  Id. at 95-96, 166-68.  His head hit the nightstand at the base of his skull.  Id. at 95-96.

Myers believes that the impact of his head hitting the nightstand knocked him unconscious. Id. at 96.  He does not recall his body hitting the floor or for how long he lay there.  Id. at 97.  When he regained his senses, he found himself was lying on his right side, facing the hot tub, with his back to the bed.  Id.  He was initially unable to get up from that position on the floor because he was dazed, his lower back hurt and he felt as if he had no strength.  Id. at 97-98.  He decided to inch toward the hot tub and use it to help get himself off the floor.  Id. at 98.  As he did this, his right foot touched the carpet near the corner of the hot tub and the carpet was wet.  Id. at 99.  Myers was able to flip onto his stomach on the floor and started pushing himself up by drawing his knees up under him.  He again felt that the carpet was wet at the corner of the hot tub; this time, feeling the

3

wetness with the top of his left foot.  Id. at 103-04.  He placed his left hand on the tiled ledge of the hot tub, near the corner, and felt wetness.  Id. at 105.  He used the tub to stand up; he moved toward the nightstand, and then placed his hands on the nightstand as a brace to position himself to sit down on the bed.  Id. at 105-06.

As he sat on the bed, Myers faced the hot tub and saw water at the base of one of the hot tub handles and water on the tile ledge near the corner.  Id. at 106-07, 109, 115-17, Exs. J, K.  He described the amount of water as "splotches" and not "a solid sheet of water."  Id.  He testified that he also saw a trickle or drop of water on the wood side panel of the hot tub, as well as a trail where water had trickled down the side panel.  Id. at 107, 116-18.  There were no towels placed on the tiled ledge of the hot tub by housekeeping.  Id. at 79.

At the base of the corner of the hot tub, Myers observed an outline of water on the carpet, with the moist area being a different shade than dry carpet and with the moist area glistening in the light.  Id. at 107, 109, 112-14, Ex. J.  Myers said that the outline of the water on the carpet was difficult to see because the carpet was a dark color.   Id. at 107, 109.  Photographs of Room 217 seem to show that the carpet is a brownish color.  Id. at Exs. A-F.  From two of the photographs, it would appear that the carpet may have a geometric-type design in it.  Id. at Exs. G, H.  Plaintiff's expert, biomechanical engineer Andrés Calderón, examined the carpet in Room 217 and found that placing water on the carpet "decreased the slip resistance of the carpet compared to the carpet being dry."  Doc. 65-5 at PAGEID#672.  He further reported that from a standing position, he was unable to visually distinguish between the wet and dry areas of carpet.  Id.

Myers testified that he was in a lot of pain immediately after his fall.  See Myers Dep. at 118.  He got up from the bed and placed towels over the areas on the hot tub and the carpet where he saw water so that he would not slip again.  Id. at 119.  He collected ice from the ice machine and used a bag to apply the ice to the back of his head and neck.  Id. at 118-20.  He eventually fell back to sleep.  He did not contact the hotel's front desk at this point in time.  Id. at 120-21.

Myers woke again sometime before 7:00 a.m.  Id. at 121.  He had a bad headache and was in a lot of pain.  Id.  He got dressed and went to the front desk to ask for directions to the hospital.  Id. at 121-22.  The hotel clerk at the front desk, Gregory Queen, called for an ambulance to take Myers to the hospital.  Id. at 122.

Queen testified that Myers called the front desk around 6:15 a.m. on July 28 to report that he hit his head and needed directions to the hospital.  See Queen Dep. at 10.  When Myers came to the front desk, Queen asked what had happened, and Myers responded that he had tripped over the hot

tub and hit his head on a desk.  Id. at 10-11.  Myers stated that he had a headache and head injury, and Queen decided to call for an ambulance and had Myers sit on a couch while waiting for the ambulance to arrive.  Id. at 11-13.

Myers remembers receiving treatment at the hospital, including scans and medication, and he was told by a doctor that he had a concussion and injury to his neck.  See Myers Dep. at 123-24.

Once Myers was taken to the hospital, Queen filled out an incident report, which was one of the hotel's standard forms.  See Queen Dep. at 17-18.  He wrote that Myers "tripped on the hot tub and fell into the desk hitting his head."  Id. at 18; doc. 65-1 at PAGEID#527.  Queen submitted the form to hotel general manager Jennifer Sigman.  See Queen Dep. at 20.

Around 7:30 a.m., Sigman talked with Queen and they reviewed the incident report.  See Queen Dep. at 20; Sigman Dep. at 34-35.  Having been told by Queen that Myers tripped and fell and hit his head, Sigman went to Room 217 to see that "everything was okay, is there anything out of place . . . did something get knocked off . . . is there anything damaged, is there any blood."  Id. at 36-37.  Sigman completed a manager's incident investigation report and noted that "nothing seemed out of place to explain the manner of the trip or fall" and that there was no property damage.  Id. at 42, Ex. 6.  Sigman did not observe water in the area of the hot tub.  Id. at 42.  Sigman never spoke with Myers about the incident.  Id. at 37 (testifying that she did not talk to Myers on the day of the accident and that she was off work the next day).

Martin sent someone to pick Myers up at the hospital and drive him back to the hotel.  See Myers Dep. at 124; Martin Dep. at 33.  Myers would guess that he got back to the hotel around 9:30 a.m., but qualified his answer with the statement that he really had "no idea" what time it was. Myers Dep. at 124.  Martin testified that he saw Myers return over the "lunchtime hour."  Martin Dep. at 31.  Myers went into the hotel's conference room, where the railroad workers meeting was taking place.  See Myers Dep. at 125.  Rather than give a presentation, he answered some questions, but he does not recall for how long he was at the meeting and does not remember what he said.  Id. at 125-26.  Martin tried to direct some questions to Myers but soon realized that Myers "was in a daze."  Martin Dep. at 35.  Myers stayed at the meeting for about an hour and a half before he excused himself.  Id. at 37.

Myers returned to his room and showered and spent the rest of the day in bed.  See Myers Dep. at 127-28.  The medication he received at the hospital made him "woozy."  Id. at 128.  He checked out of the hotel on July 29.  Id.  Upon arriving home, Myers received treatment for his injuries and was diagnosed with a concussion, posttraumatic cephalagia, posttraumatic neuralgia and

aggravation of a prior lower back injury.  Id. at 138.  Myers still has symptoms relating to the accident, including nausea, headaches and neck and back pain.  Id. at 139-44.

Sigman believes that Mary Dreher was likely the housekeeper who cleaned Room 217 prior to Myers's arrival on July 27.[1]  See Sigman Dep. at 23.  Housekeepers are instructed to look over "anything and everything when they go into the room" and report "right away" if they see something unsafe or in need of repair.  Id. at 9.  Such items are reported by way of a maintenance request.  Id. at 9-10.  A room is made available for check-in by the next guest only after housekeeping has signed off on the room.  Id. at 14.

Dreher filled out a maintenance request ticket that had a date of July 28 on it.  See doc. 65-2 at PAGE ID#560.  She simply wrote "Jacuzzi Tub Handle."  Id.  The ticket did not indicate at what time Dreher entered Room 217 or filled out the report.  Sigman stated that she is unaware of when Dreher was in Room 217 on July 28, but that it could have been at some point after 9:30 a.m. when her shift started.  See Sigman Dep. at 59-60.  Rooms are typically attended to by housekeepers between 11:00 a.m. and 3:00 p.m.  Id. at 14.  When Sigman entered Room 217 that morning, housekeeping had not made up the room.  Id. at 51.  Sigman believes that she spoke with Dreher after Dreher wrote the ticket and confirmed that Dreher did not see "anything out of the ordinary" in Room 217, but Sigman did not make any separate written record about the particular reason Dreher wrote the ticket.  Id. at 46.

Myers does not know if anyone had been in the room before he came back from the railroad workers meeting.  See Myers Dep. at 127.  Nobody from housekeeping entered his room while he spent the rest of the day in bed.  Id. at 129-30.

The maintenance supervisor for the hotel was Bob Groves.[2]  See Sigman Dep. at 16.  Sigman did not speak to Groves about Dreher's maintenance report.  Id. at 45-46.  The records indicate that Groves wrote "Fix" on the ticket by Dreher on July 29 or 30.  See doc. 65-2 at PAGE ID#552 and #560.  Sigman has no records to show exactly what Groves did to fix the tub handle.  See Sigman Dep. at 46.  Sigman believes that the nature of the problem with the tub handle was likely that it was "stripped," meaning that the handle turned without stopping.  Id. at 42-43.  This belief is based on her observation as a general manger that the common thing wrong with handles "is that the just turn, they don't stop."  Id. at 43.  The hotel's current maintenance supervisor,

---

[1]  According to defendants, Dreher passed away before this suit was filed.

[2]  Groves left his position with defendants before this suit was filed.  See Sigman Dep. at 16.  He has not been deposed, nor have the parties submitted an affidavit from him.

Christopher Wilson, testified that from just looking at Dreher's ticket "[i]t implies a problem with the handle itself" but that he could not ascertain exactly "what the problem was."  Wilson Dep. at 33.  He further testified that in his experience hot tubs "don't leak at the handle."  Id. at 35.  A leak would typically occur underneath or behind the access panel "where the pipe would meet the jet."  Id. at 30.

A computerized maintenance report listing for Room 217 shows that on July 24, 2012 Groves fixed an access panel for the hot tub that was perhaps loose or not properly seated.  See Sigman Dep. at 65-67, Ex. 7.  The only other maintenance item for the hot tub occurred in September 2010, when Groves fixed a handle that came off of the hot water faucet.  Id. at 67, Ex. 7.

The guest who occupied Room 217 immediately prior to Myers was Craig Czarnota, who checked out of the hotel on July 27, 2012.  He recalls that there was a hot tub in the room.  See Czarnota Dep. at 9.  He did not use the hot tub.  Id. at 10.  He did not notice the carpet being wet near the hot tub.  Id. at 12-13 (testifying that he walked through the area barefoot).  He recalls that white towels were rolled or folded up and placed on top of the hot tub.  Id. at 14.  He did not see any water leaking from the hot tub handles.  Czarnota Aff. at ¶6.  Czarnota did not observe any water leaks relating to the hot tub and thus did not report any such problems to the hotel staff.  Id. at ¶8.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009).  The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson,

477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.    Discussion

### A.      Premises Liability to Business Invitees

The elements of a negligence action are: (1) defendant owed a duty of care to the plaintiff, (2) defendant breached that duty, and (3) defendant's breach proximately caused the plaintiff to be injured.  Lang v. Holly Hill Motel, Inc., 122 Ohio St. 3d 120, 122, 909 N.E.2d 120, 122-23 (Ohio 2009).  For purposes of the motions for summary judgment, the parties treat the defendants as indistinguishable in analyzing the elements of a negligence claim.  The record establishes that Coshocton Village Inn, Ltd. owns the Coshocton Village Inn and has entered into a Management Agreement with C.P. Management Company.  Under the Management Agreement, C.P. Management is designated as the agent of Coshocton Village Inn, Ltd. and is responsible for operating the hotel and inspecting, maintaining and repairing the hotel and its premises.  See doc. 65-2.  Hotel general manager Jennifer Sigman testified that she is employed and supervised by C.P. Management.  See Sigman Dep. at 5-6.

"When the alleged negligence occurs in the premises-liability context, the applicable duty is determined by the relationship between the landowner and the plaintiff." Lang, 122 Ohio St.3d at 122, 909 N.E.2d at 123 (citing Gladon v. Greater Cleveland Regional Transit Auth., 75 Ohio St.3d 312, 315, 662 N.E.2d 287, 291 (Ohio 1996)).  Hotel guests are business invitees.  Id., 122 Ohio St.

3d 120 at 123, 909 N.E.2d at 123; Kerr-Morris v. Equitable Real Estate Inv. Mgmt, Inc., 136 Ohio App.3d 331, 333, 736 N.E.2d 552, 554 (Ohio Ct. App. 1999). Defendants thus owed Myers a duty "to exercise ordinary care and to protect [him] by maintaining the premises in a safe condition." Lang, 122 Ohio St. 3d 120 at 123, 909 N.E.2d at 123 (internal quotation marks omitted). "This duty includes maintaining the premises in a reasonably safe condition and warning the invitees of latent defects of which the hotel has or should have knowledge. But the hotel does not have to protect invitees from open and obvious dangers that invitees may be reasonably expected to discover themselves." Kerr-Morris, 136 Ohio App. 3d at 333, 736 N.E.2d at 554.

In order for a business invitee to prove that a premises owner breached the duty of care, he must demonstrate either:

1. That the defendant through its officers or employees was responsible for the hazard complained of; or

2. That at least one of such persons had actual knowledge of the hazard and neglected to give adequate notice of its presence or remove it promptly; or

3. That such danger had existed for a sufficient length of time reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care.

Johnson v. Wagner Provision Co., 141 Ohio St. 584, 589, 49 N.E.2d 925, 928 (Ohio 1943). The first method of proving a breach is typically established through evidence that a defendant created the hazard. See, e.g., Ray v. Wal-Mart Stores, Inc., 993 N.E.2d 808, 817 (Ohio Ct. App. 2013); Baudo v. Cleveland Clinic Found., 113 Ohio App.3d 245, 247-48, 680 N.E.2d 733, 734 (Ohio Ct. App. 1996).

Defendants argue that no evidence exists to show that they created the hazardous condition by which Myers allegedly slipped and fell. They contend that the evidence does not support an inference that an employee of the defendants caused the hot tub handle to leak or otherwise placed a liquid near or on the carpet at the corner of the hot tub. Defendants further contend that there is no evidence to support an inference that they had actual knowledge of the condition prior to the accident. The previous guest did not report any problems regarding the room to hotel staff, and the housekeeper did not discover any problem with the hot tub handle until after the accident. Finally, defendants contend that they cannot be charged with constructive notice of the hazard because the maintenance records for Room 217 do not indicate any previous leaking or water hazards associated with the hot tub.

Plaintiff responds by arguing that defendants breached their duty of care in two ways.  He argues that the alleged leaky handle was a hazard of which defendants had actual and constructive knowledge.  He also argues that the wet carpet was a hazard for which defendants are responsible. He contends that it was foreseeable for the area immediately around the hot tub to get wet and that defendants created a hazardous condition by placing the hot tub in the middle of the room and surrounding it with dark carpet, such that a reasonable observer could not ascertain when the carpet was wet.

**B.      The Leaky Handle**

Plaintiff alleges that the source of the water was a leak at the hot tub handle.  Defendants insist, based on the testimony of their current maintenance supervisor, Christopher Wilson, that hot tubs "don't leak at the handle."  See Wilson Dep. at 35 (explaining that "you can unscrew the handle and pull them all of the way out and they won't leak").   Nonetheless, Myers offered competing testimony which, if credited, would support a reasonable inference that there was a leak at the handle at the time of his accident.  Myers testified that as he sat on the bed immediately after his fall he saw water under a faucet handle and on the corner of the tiled ledge.  He testified that on the side of the hot tub he saw a trickle of water and a trail leading down to the carpet.  This testimony would support an inference that water had been accumulating at the top corner of the hot tub and that a leaky handle was a plausible source of the water.

Plaintiff does not allege that defendants caused the handle to leak, so he must show that they had actual or constructive knowledge of the leak.  As defendants correctly argue, plaintiff has not submitted any evidence of actual knowledge.  The maintenance records for Room 217 contained no indication that a handle had been leaking before or at the time of Myers's stay.  Craig Czarnota, the room guest prior to Myers, testified that he did not observe any water leaking from the handles and that he did not report any problems with the room to hotel staff.

The only hotel employee whom plaintiff can place in Room 217 between Czarnota's check-out and Myers's fall is housekeeper Mary Dreher.  Plaintiff has not submitted evidence from which an inference can be drawn that Dreher had actual knowledge of a leaky handle prior to his fall.  She cleaned the room on July 27 but did not report any maintenance issues on that day.  Dreher dated her maintenance ticket for the problem with the "Jacuzzi Tub Handle" on July 28.  Plaintiff does not argue that Dreher noticed the problem the day before, and there is no evidence to suggest she did. Sigman testified that housekeepers were instructed to report issues "right away" and that rooms would be ready for check-in by the next guest only after housekeeping had signed off on the room.

10

See Hall v. Shoe Show, Inc., No. 1:15-cv-1070, 2015 WL 7069339 at *4 (N.D. Ohio Nov. 12, 2015) (holding that an inference should not be drawn that store deviated from its policy of performing nightly vacuuming, where plaintiff failed to submit evidence otherwise).

In the absence of evidence of actual knowledge, plaintiff asserts that the unavailability of Dreher as a witness should give rise to an adverse inference that defendants had actual knowledge of the alleged leaky handle. Plaintiff has not developed any argument or cited a legal basis to support this assertion. The court finds that the circumstance of Dreher being unavailable due to her death does not warrant the adverse inference that plaintiff asserts should be drawn. Cf. Automated Sols. Corp. v. Paragon Data Sys., Inc., 756 F.3d 504, 513 (6th Cir. 2014) (discussing when an adverse inference can be drawn if a party has lost or destroyed evidence); Crossley Const. Corp. v. NCI Bldg. Sys., L.P., 123 Fed. App'x 687, 693 (6th Cir. 2005) (discussing the "missing witness rule" rule whereby an adverse inference is permitted from the failure of a defendant to call a witness peculiarly within its power to produce); Fed. R. Evid. 804(a)(4) (permitting an exception to the hearsay rule when a declarant is unavailable because of death).

Plaintiff has likewise failed to submit evidence from which a reasonable inference could be drawn that defendants had constructive knowledge of the leaky handle. "To show that a premises owner possessed constructive knowledge of the hazard, evidence of how long the condition existed is mandatory." Ray, 993 N.E.2d at 824 (internal quotation marks omitted); see also Presley v. City of Norwood, 36 Ohio St.2d 29, 32, 303 N.E.2d 81, 84 (Ohio 1973) (stating that "evidence as to the length of time the hazard had existed is necessary to support an inference" that the premises owner had constructive knowledge). "Without such evidence, it is impossible to determine whether a premises owner should have discovered the hazard upon a reasonable inspection." Ray, 993 N.E.2d at 824 (further noting that Ohio courts routinely grant summary judgment in slip-and-fall cases where plaintiff fails to produce evidence of how long a hazard existed before the plaintiff's fall) (citing cases).

Plaintiff has not set forth evidence of how long the handle had leaked prior to his fall. Importantly, there is no evidence to support an inference that the handle either was leaking or had been leaking when Dreher cleaned Room 217 on July 27. Defendants have submitted testimony from Czarnota that he did not see water leaking from the handles during his stay, which ended on July 27. Even crediting Myers's testimony that he saw a leaky handle at the time of his fall, it would require pure speculation, at least on the record before the court, to infer that the handle had started to leak by the time Dreher cleaned the room on the day before. See Lacy v. Wal-Mart Stores, No.

11 BE 32, 2012 WL 1307075 at *7 (Ohio Ct. App. Mar. 27, 2012) (argument relying on speculation to establish negligence claim is insufficient to defeat summary judgment).

Plaintiff makes unsupported assertions that the handles had a "history of leaking," leaving streaks on the wood side panel of the hot tub from where water had trickled down to the carpet. Doc. 65 at 19.  Plaintiff argues that the streaks would have been readily observable to the housekeeping staff.  But there is no support for there being either a "history of leaking" or observable streaks.  Plaintiff's expert, Andrés Calderón, reported that he saw corrosion when he removed the handles from the hot tub in Room 217. Doc. 65-5 at PAGEID#672.  He stated that this showed "the potential for leaking."  Id. at 676.  However, Calderón, who conducted his examination over three years after the accident, did not opine that the corrosion was evidence of a history of leaks, nor did he opine that the corrosion or a leak existed at the time Dreher cleaned Room 217 on July 27.  And as for the assertion that the side panel had streaks, Myers testified only that he saw a droplet and a trail where water from the leak had been at the time of his fall; he did not testify that he saw streaks or stains or discoloration on the panel.

Accordingly, the court grants summary judgment to defendants on plaintiff's theory that defendants breached their duty of care because they had actual or constructive knowledge of a leaky handle but failed to fix the handle or warn plaintiff of the hazard.

### C.  The Dark Carpet

Plaintiff's other negligence theory is that defendants created a hazardous condition by placing the hot tub in the mid-section of the room and surrounding it with dark carpet.  Defendants respond by arguing that they did not have actual or constructive knowledge of wet carpet conditions.  They argue that there is no record of complaints about wet carpet conditions in rooms with hot tubs and no record of slip-and-fall incidents in such rooms.

The defendants' argument regarding actual and constructive knowledge misses the mark. Ohio law sets forth three separate ways for a business invitee to establish breach by a premises owner.  See Johnson, 141 Ohio St. at 589, 49 N.E.2d at 928.  "If the plaintiff proves that defendant or its employees created the dangerous condition, the plaintiff does not have to show that defendant had knowledge of the dangerous condition." Baudo v. Cleveland Clinic Found., 113 Ohio App. 3d 245, 247-48, 680 N.E.2d 733, 734 (Ohio Ct. App. 1996).  This is so because "one who has created the condition is presumed to know what it created." Crane v. Lakewood Hosp., 103 Ohio App. 3d 129, 136, 658 N.E.2d 1088, 1093 (Ohio Ct. App. 1995).  As such, "'evidence presented by defendant stat[ing] merely that no complaints have been received, and there were no prior reported

falls . . . does not negate defendant's creating a dangerous condition, which caused plaintiff to fall and be injured.'" Id. (quoting Tandy v. St. Anthony Hosp., No. 88AP-551, 1988 WL 129161 at *2 (Ohio Ct. App. Nov. 29, 1988)).

Plaintiff has submitted evidence, in the form of testimony and photographs, to support the assertion that the carpet in Room 217 was dark and the assertion that it was difficult to visually distinguish between wet and dry areas of the carpet. See Myers Dep. at 107, 109, Exs. A-J; Report of Andrés Calderón, doc. 65-5 at PAGEID#672. Further, Myers testified that at the time of his accident the carpet near the corner of the hot tub was wet and that the wetness caused his left foot to slip. See Myers Dep. at 113. Plaintiff's expert reported that making the carpet wet decreased its slip resistance Doc. 65-5 at PAGEID#672. It is undisputed that the carpet abutted the side panels at the base of the hot tub. It is also undisputed that the hot tub was positioned in the mid-section of the room, between the bed, on one side, and the bathroom and room door, on the other side.

Thus, plaintiff has set forth evidence from which a jury might find that defendants created a hazardous condition in Room 217 at their hotel. Defendants have not argued in the present motions that they did not create the allegedly hazardous condition or are not otherwise responsible for it. Plaintiff must also establish that an injury from the allegedly hazardous condition was reasonably foreseeable. In premises liability cases where a plaintiff alleges that his injury was caused by defendant's placement or arrangement of items, courts require the owner to "'take reasonable precautions to protect the invitee from dangers which are foreseeable from [the premises'] arrangement or use.'" Sauter v. One Lytle Place, No. C-040266, 2005 WL 627794 at *4 (Ohio Ct. App. Mar. 18, 2005) (quoting Prosser, Law of Torts at 393, § 61 (4th Ed. 1971)) (emphasis omitted); see also Crane, 103 Ohio App. 3d at 136, 658 N.E.2d at 1093; Weber v. Menard, Inc., No. 2:13-cv-229, 2014 WL 4965940 at *7 (S.D. Ohio Oct. 3, 2014) (citing cases).

The court finds that a jury could reasonably determine that the particular arrangement and use of Room 217 created a foreseeable risk of a slip-and-fall incident. This determination would begin with the common-sense acknowledgement that hot tubs are intended to hold water and have water pipes leading to them; a jury could find that a potential exists for escaped water to be present in the area immediately surrounding a hot tub, whether from the splashing of water in the tub or the dripping of water from a guest exiting the tub or from a faulty pipe or handle connection. See Strother v. Hutchinson, 67 Ohio St. 2d 282, 287-88, 423 N.E.2d 467, 471 (Ohio 1981) (holding that the precise manner of injury need not be foreseeable; "It is sufficient that his act is likely to result in injury to someone. . . . [I]f an event causing injury appears to have been closely related to the danger

created by the original conduct, it is regarded as within the scope of the risk, even though, strictly speaking, the particular injury would not have been expected by a reasonable man in the actor's place") (internal quotation marks omitted).[3] Defendants placed carpeting in the zone around the hot tub where the floor might get wet. Plaintiff's evidence, as well as a common experience, could reasonably persuade a juror that wet carpet is more slippery than dry carpet and that it may be difficult to visually discern wet areas in carpet which is dark in color or has a geometric design in it. Finally, a jury could find that the hot tub's placement in an area of the room through which guests naturally had to walk as they went between the bed and the bathroom and room door created a foreseeable risk of a slip-and-fall accident. In sum, the court finds that the issues regarding negligence and foreseeability are ones over which reasonable minds could differ and that the matter should be submitted to a jury.

The court's conclusion comports with the case law. In Crane, plaintiff fell when a chair slid out from under her in an atrium area of a hospital. The court held that there was a triable issue regarding the foreseeability of harm to visitors from the placement of the chair in the atrium because plaintiff had submitted evidence that the atrium floor was tiled and that the chair was top-heavy and "likely to slide out from a person bending over." 103 Ohio App. 3d at 136, 658 N.E.2d at 1093. In Tandy, plaintiff tripped on a doormat as he passed through a hospital door and the door caused the doormat to bunch up. The court held that there was a triable issue concerning whether the placement of the doormat made for a tripping hazard to be the "natural result." 1988 WL 129161 at *2. In Sauter, a guest at a swimming pool slipped in a kitchenette area, which was less than ten feet from the pool and which had a linoleum floor that defendant allegedly made "unusually slippery" by the application of wax to the floor. The court held that there was a triable issue as to the foreseeability of harm because of the kitchenette's proximity to the pool, the intent that the kitchenette be used by pool guests and the peculiar slipperiness of the floor. 2005 WL627794 at *4. See also Kerr-Morris, 136 Ohio App.3d at 334, 736 N.E.2d at 554-55 (triable issue where hotel

---

[3] Accord Ratliff v. Mikol, 2011-Ohio-2147, ¶ 8 (Ohio Ct. App. May 5, 2011); Ohio Jury Instr., Civil § 401.07 ("The test for foreseeability is not whether a person should have foreseen the injury exactly as it happened to the specific person. The test is whether under all the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely result in some injury."); Marshall v. Burger King Corp., 222 Ill. 2d 422, 442, 856 N.E.2d 1048, 1060 (Ill. 2006) ("'[W]hat is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence.'") (quoting Bigbee v. Pacific Telephone & Telegraph Co., 34 Cal.3d 49, 57–58, 665 P.2d 947, 952 (Cal. 1983)).

placed nonslip strips on shower floor but guests could not readily discern if nonslip surface of strips had worn away); Weber, 2014 WL 4965940 at *7 (triable issue where store allegedly arranged or stacked items in such a way that items could foreseeably become dislodged and unstable).

Accordingly, summary judgment is denied to defendants on plaintiff's theory that defendants created a hazardous condition by placing a hot tub in the mid-section of Room 217 and surrounding it with dark carpet.

**IV.     Conclusion**

The motions for summary judgment (docs. 62 and 63) are granted in part and denied in part. Defendants' motion to strike plaintiff's surreply brief (doc. 69) as not authorized by S.D. Ohio Local Civil Rule 7.2(a)(2) is granted.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: May 16, 2016